No. 12–13260–P

_____

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

| | |
|---|---|
| ANTHONY JOSEPH FARINA,<br>　　　　Petitioner-Appellant,<br><br>v.<br><br>SECRETARY, FLORIDA<br>DEPARTMENT OF<br>CORRECTIONS, et al.,<br>　　　　Respondent-Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| ) | **Capital Case** |
| ) | On Appeal from the U.S.<br>District Court for the Middle<br>District of Florida |
| ) | No. 6:06-cv-1768 |

_____

**BRIEF FOR AMERICANS UNITED FOR SEPARATION OF
CHURCH AND STATE, AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, CENTRAL
CONFERENCE OF AMERICAN RABBIS, INTERFAITH ALLIANCE
FOUNDATION, NATIONAL COUNCIL OF JEWISH WOMEN,
GENERAL SYNOD OF THE UNITED CHURCH OF CHRIST, UNION
FOR REFORM JUDAISM, UNITARIAN UNIVERSALIST
ASSOCIATION OF CONGREGATIONS, AND WOMEN OF REFORM
JUDAISM AS *AMICI CURIAE* IN SUPPORT OF APPELLANT AND
REVERSAL**

_____

Andrew L. Frey
Evan M. Tager
Brian D. Netter
E. Brantley Webb[*]
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000

*Attorneys for Amici Curiae*
* Admitted only in Tennessee,
supervised by principals of the firm

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*Farina v. Secretary, Florida Dep't of Corrections*, No. 12–13260–P

Set forth below is a list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of a party's stock, and other identifiable legal entities related to a party, to the best of my knowledge:

American Civil Liberties Union (*amicus curiae*)

American Civil Liberties Union of Florida (*amicus curiae*)

Americans United for Separation of Church and State (*amicus curiae*)

Anstead, Harry Lee (former Florida Supreme Court Justice)

Bass, David (former attorney on post conviction appeal)

Beck, Kevin T. (prior post conviction attorney)

Bell, Kenneth (former Florida Supreme Court Justice)

Blount, Uriel (judge at first trial)

Bondi, Pamelo Jo (Attorney General, State of Florida)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*Farina v. Secretary, Florida Dep't of Corrections*, No. 12–13260–P

Butterworth, Robert A. (former Attorney General, State of Florida)

Cantero, Raoul (former Florida Supreme Court Justice)

Central Conference of American Rabbis (*amicus curiae*)

Crist, Jr., Charles J. (former Attorney General, State of Florida)

Dees, Jeffrey L. (former attorney on appeal of first trial)

DeLiberato, Maria E. (counsel of record)

Frey, Andrew L. (counsel for *amici curiae*)

General Synod of the United Church of Christ (*amicus curiae*)

Gordon, Kimberly (surviving victim)

Grimes, Stephen (former Florida Supreme Court Justice)

Gruber, Mark (former attorney on post conviction appeal)

Harding, Major B. (former Florida Supreme Court Justice)

Hathaway, William (former attorney at second trial)

Honeywell, Charlene (U.S. District Court, Middle District of Florida)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*Farina v. Secretary, Florida Dep't of Corrections*, No. 12–13260–P

Interfaith Alliance Foundation (*amicus curiae*)

Jennings, Bill (Capital Collateral Regional Counsel-Middle)

Kogan, Gerald (former Florida Supreme Court Justice)

Lewis, R. Fred (Florida Supreme Court Justice)

Mason, Derek (surviving victim)

McCollum, Bill (former Attorney General, State of Florida)

Mott, Thomas (trial attorney at first trial)

National Council of Jewish Women (*amicus curiae*)

Netter, Brian D. (counsel for *amici curiae*)

Nunnelley, Kenneth S. (Assistant Attorney General)

Overton, Ben T. (former Florida Supreme Court Justice)

Pariente, Barbara (Florida Supreme Court Justice)

Parmer, Marie-Louise Samuels (counsel of record)

Plucker, Nathaniel (former Post Conviction Attorney)

Quince, Peggy A. (Florida Supreme Court Justice)

Robinson, Gary (surviving victim)

Roper, Margaret A. (Assistant Attorney General on first appeal)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*Farina v. Secretary, Florida Dep't of Corrections*, No. 12–13260–P

Sabella, Candace M. (prior Assistant Attorney General)

Scalley, Leslie Anne (prior post conviction attorney)

Shaw, Jr., Leander J. (former Florida Supreme Court Justice)

Smith, C. McFerrin (judge at second trial and state post conviction)

Tager, Evan M. (counsel for *amici curiae*)

Tanner, John (prosecutor at first and second trial)

Union for Reform Judaism (*amicus curiae*)

Unitarian Universalist Association of Congregations (*amicus curiae*)

Van Ness, Michelle (victim, deceased)

Webb, E. Brantley (counsel for *amici curiae*)

Wells, Charles T. (former Florida Supreme Court Justice)

Women of Reform Judaism (*amicus curiae*)

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
　　　DISCLOSURE STATEMENT............................................... C–1

TABLE OF CITATIONS.................................................................. ii

INTEREST OF THE *AMICI CURIAE*................................................ 1

STATEMENT OF ISSUES............................................................... 2

STATEMENT OF THE CASE .......................................................... 2

SUMMARY OF ARGUMENT ........................................................ 11

ARGUMENT ............................................................................... 13

I.　　BY INVOKING THE BOOK OF ROMANS TO JUSTIFY
　　　CAPITAL PUNISHMENT, PROSECUTOR TANNER
　　　IMPERMISSIBLY INJECTED RELIGIOUS DOCTRINE
　　　INTO THE JURY'S DECISION-MAKING PROCESS.............. 14

II.　　TANNER'S USE OF RELIGIOUS DOCTRINE
　　　UNDERMINED THE SENTENCING DISCRETION OF THE
　　　JURY................................................................................ 22

III.　THESE CONSTITUTIONAL VIOLATIONS CANNOT BE
　　　DISMISSED AS A HARMLESS FORAY THAT WAS
　　　INVITED BY FARINA'S TENDERING OF HIS PASTOR AS
　　　A CHARACTER WITNESS.................................................... 26

　　　A.　　Petitioner Did Not Open The Door To The
　　　　　　Prosecutor's Invocation Of Religious Doctrine ............. 26

　　　B.　　The Constitutional Violations Were Highly
　　　　　　Prejudicial To Petitioner .............................................. 30

CONCLUSION ........................................................................... 33

APPENDIX: DESCRIPTIONS OF THE *AMICI*

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF CITATIONS

**Page(s)**

**CASES**

*Berger v. United States*, 295 U.S. 78 (1935) .................................. 26

*Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985) .......................... 23

*Caldwell v. Mississippi*, 472 U.S. 320 (1985).......................... *passim*

*Carruthers v. State*, 528 S.E.2d 217 (Ga. 2000) ............................ 14

*Chandler v. Florida*, 449 U.S. 560 (1981) ...................................... 14

*Cnty. of Allegheny v. Am. Civil Liberties Union Greater
Pittsburgh Chapter*, 492 U.S. 573 (1989).................................. 20

*Commonwealth v. Chambers*, 599 A.2d 630 (Pa. 1991) ................. 16

*Darden v. Wainwright*, 477 U.S. 168 (1986)...................... 24, 31, 32

*Eddings v. Oklahoma*, 455 U.S. 104 (1982)................................... 27

*Engel v. Vitale*, 370 U.S. 421 (1962).............................................. 21

*Epperson v. Arkansas*, 393 U.S. 97 (1968)................................... 20

*Farina v. Sec'y, Dep't of Corr.*, No. 6:06–cv–1768, 2012 WL
1016723 (M.D. Fla. Mar. 26, 2012).................................... *passim*

*Farina v. State*, 937 So. 2d 612 (Fla. 2006)........................... *passim*

*Jones v. Kemp*, 706 F. Supp. 1534 (N.D. Ga. 1989) ...................... 15

*Larson v. Valente*, 456 U.S. 228 (1982)........................................ 22

*Lockett v. Ohio*, 438 U.S. 586 (1978) ............................................ 27

*Long v. State*, 883 P.2d 167 (Okla. Crim. App. 1994) ................... 15

*Malone v. State*, 168 P.3d 185 (Okla. Ct. Crim. App. 2007) .......... 16

*Oakley v. State*, 68 S.W.2d 204 (Tex. Ct. Crim. App. 1934).......... 14

*People v. Harlan*, 109 P.3d 616 (Colo. 2005) ................................ 17

*Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) .................... 29, 31

*Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) ... 14, 17, 25, 32

## TABLE OF CITATIONS
### (continued)

**Page(s)**

*Shere v. Sec'y, Fla. Dep't of Corr.*,
537 F.3d 1304 (11th Cir. 2008) .......................................... 28, 29

*State v. Ceballos*, 832 A.2d 14 (Conn. 2003) ................................. 16

*United States v. Young*, 470 U.S. 1 (1985) ............................... 26, 29

*Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005) .............................. 30

*Wilson v. Kemp*, 777 F.2d 621 (11th Cir. 1985) ............................. 29

## STATUTES AND RULES

28 U.S.C. § 2254 ....................................................... 10

Fed. R. App. P. 29(c)(5) .................................................. 1

## OTHER AUTHORITIES

All-American Council of the Orthodox Church in Am., *Minutes of the Ninth Plenary Session* (1989) ............................................ 19

Ben Zion Bokser, *Statement on Capital Punishment, in* 3 Proceedings of the Committee on Jewish Law and Standards 1927–1970 (1960) .................................................... 19

Derek Catron, *Your State Attorney: Man of God, Man of Law*, DAYTONA NEWS-J., June 24, 2007, at 1A, *available at* 2007 WLNR 12011085 ...................................................... 3

Cent. Conf. of Am. Rabbis, Resolution of March 1979 ................. 19

Church of Jesus Christ of Latter-Day Saints, Capital Punishment, http://www.mormonnewsroom.org/official-statement/capital-punishment (last visited Nov. 18, 2012)....... 20

Editorial, *Tanner the Evangelist Forgets Role at Memorial* DAYTONA NEWS-J., May 13, 2000, at 4A ....................................... 3

Episcopal Church, *Journal of the General Convention of the Episcopal Church, Phoenix, 1991*, at 377 (1992)........................ 19

Evangelical Lutheran Church in Am., *Social Statement On: The Death Penalty* (1991). ............................................... 20

iii

## TABLE OF CITATIONS
### (continued)

**Page(s)**

Gen. Assemblies of the Unitarian Universalist Ass'n, 1979
General Resolution.................................................................... 19

Melissa Kossler, *Reflections: The Century in Review* Daytona
News-J., Oct. 31, 1999, at 14H .................................................. 3

Ludmilla Lelis, *State Attorney Goes with No Regrets*, Orlando
Sentinel, Jan. 6, 2009, at B1, *available at* 2009 WLNR
249781....................................................................................... 3

Letter from James Madison to Edward Livingston (July 10,
1822), *in* James Madison, Writings (Library of Am. 1999).......... 21

Nat'l Ass'n of Evangelicals, Capital Punishment 1973................... 20

Nat'l Council of Churches, *NCC Supports Moratorium on Death
Penalty* (2000) ........................................................................... 18

Romans 13:1-7.................................................................. *passim*

Southern Baptist Convention, Resolution on Capital
Punishment (2000)..................................................................... 18

U.S. Conf. of Catholic Bishops, *A Culture of Life and the
Penalty of Death* (2005) ............................................................ 19

## INTEREST OF THE *AMICI CURIAE*

*Amici*,[1] who have filed a motion for leave to file this brief, are Americans United for Separation of Church and State, American Civil Liberties Union, American Civil Liberties Union of Florida, Central Conference of American Rabbis, Interfaith Alliance Foundation, National Council of Jewish Women, General Synod of the United Church of Christ, Union for Reform Judaism, Unitarian Universalist Association of Congregations, and Women of Reform Judaism.

Although *amici* represent diverse religious and secular perspectives, they are united in the view that the decision between life and death in a capital case should not turn on the jury's interpretation of religious doctrine. *Amici* believe that the use of religious doctrine to convince a jury to recommend a death sentence is an affront to religion and undermines a defendant's right to a fair trial.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), *amici* state that no party's counsel authored this brief in whole or in part and no person or entity, other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

**STATEMENT OF ISSUES**

This brief is limited to the following issue:

Whether the prosecutor violated Farina's constitutional rights by eliciting testimony that biblical precepts (as interpreted by the prosecutor and the witness) required the jury to acquiesce in the prosecutor's request to impose the death penalty.

**STATEMENT OF THE CASE**

1.     This case concerns the propriety of the "biblical strategy" used by the prosecution during the penalty-phase trial of petitioner Anthony Farina. *Farina v. State*, 937 So. 2d 612, 641 (Fla. 2006) (per curiam) (Anstead, J., concurring in part and dissenting in part).  Highlighted by an extensive colloquy with a prison pastor on one denomination's interpretation of the Christian Bible, and bookended by religious references at the beginning and at the end of the resentencing trial, the prosecutor's reliance on religious doctrine permeated the proceedings.

a.     Prosecutor John Tanner began laying the groundwork for his use of religion to influence the jury when, during the selection of the sentencing panel, he told the prospective jurors that while they were expected to follow the judge's instructions on the law, they

were "*not* required, or expected, to abandon deeply held religious, moral, conscientious, or other beliefs" and that it was therefore "perfectly legitimate" to disregard the judge's legal instructions in the event of a conflict with moral or religious principles.  (Doc. 65, Ex. F-19, at 882 (emphasis added).)[2]

    b.    During the ensuing sentencing trial, as part of an effort to persuade the jury to show mercy to Farina, the defense presented the testimony of Reverend James Davis, a prison pastor affiliated with Stetson Baptist Church who had counseled Farina.  Reverend

---

[2] Tanner is a highly polarizing figure who has sought to inject religion into the criminal justice system since his conversion to fundamentalist Christianity at age 40.  *See* Derek Catron, *Your State Attorney: Man of God, Man of Law*, Daytona News-J., June 24, 2007, at 1A, *available at* 2007 WLNR 12011085.  "[R]eligious conviction . . . first led him to run" for prosecutor.  Ludmilla Lelis, *State Attorney Goes with No Regrets*, Orlando Sentinel, Jan. 6, 2009, at B1, *available at* 2009 WLNR 249781.  After he was elected as State Attorney, Tanner's tenure was marked by a series of controversies involving his intertwining of religion with his official duties.  He conducted publicized prayer sessions with a condemned murderer.  Catron, *supra.*  He was criticized for giving a speech at a law-enforcement event that used "strongly parochial and therefore inappropriate words for an elected state official addressing an audience that could include followers of some other religion."  Editorial, *Tanner the Evangelist Forgets Role at Memorial*, Daytona News-J., May 13, 2000, at 4A, *available at* 2000 WLNR 9075379.  And he was briefly voted out of office for trying "to launch an anti-pornography campaign . . . that was labeled as a religious crusade."  Melissa Kossler, *Reflections: The Century in Review*, Daytona News-J., Oct. 31, 1999, at 14H.

Davis testified to Farina's reformed character and his genuine embrace of Christianity. (Doc. 65, Ex. F-24, at 1822–27.)

On cross-examination, Tanner asserted a personal religious view—"I believe there's sincerely hell"—and proceeded to ask Reverend Davis whether he had "put any thought or evaluation into how [Farina] stacked up according to the Bible." (Doc. 65, Ex. F-24, at 1836.) He then proceeded to use Reverend Davis as a conduit for the application of Christian theology to the jury's sentencing decision. He began by establishing a foundation for the significance of the Christian Bible:

> Q. What is the Bible to you?
>
> A. It's the infallible word of God, inspired word of God that God gave to us as our—for lack of words, it would be like our instruction manual for life to where we can live by.

(*Id.* at 1837.) Tanner then asked Reverend Davis for his general impressions of the Book of Romans and, in particular, the first seven verses of chapter 13:

> Q. Are you familiar with the first seven verses of Romans thirteen?
>
> A. Yes. About honoring authority, submitting to authority. The judge and the prosecutor and the defense attorneys all work for God and are ordained by God as being the

4

authority and in the positions that they are
and if they—God is the one that allows them to
be there.

Q. Well, I don't want to say that defense
attorneys aren't saved. But they're not the
authorities, are they, they are defense lawyers
versus the prosecutor?

A. Right.

(*Id.* at 1838.)   That paraphrase of the Bible was inadequate for

Tanner's purposes, so he supplied Reverend Davis "something to

help with his memory"—a copy of the Book of Romans.   (*Id.*)

Tanner then directed Reverend Davis to read directly from chapter

13:

Q. What does Romans one and two say
about authority under God's law?

[Defense    objection    as    to    relevance
overruled.]

THE WITNESS: Read verse one and two?

MR. TANNER: Yes, sir.

A. Everyone must submit himself to the
governor of authorities for there is no authority
except for which God has established. The
authorities that exist have been established by
God. Consequently, he who rebels against the
authority is rebelling against what God has
instituted. And those who do so will bring
judgment on themselves.

5

> Q. The next verse deals with the prosecutor; does it not? What does it say?
>
> A. For the rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear that the one in authority and do what is right and you will— jumps over here—he will commend you [sic].
>
> Q. And the next verse?
>
> A. Where he is God's servant to do your good, but if you do wrong, be afraid for he does not bear the sword for nothing. He is God's servant and agent to wrath, to bring punishment to the wrongdoer.
>
> Q. And the next?
>
> A. Therefore, it is necessary to submit to the authorities not only because of the possible punishment, but also because of your conscience.

(*Id.* at 1839-40.)   Next, Tanner established, through Reverend Davis, that Southern Baptists do not believe that the government should show mercy for criminal acts:

> Q. Is there anything in scripture that you find that says the laws and the government should excuse crimes because someone is repentant?
>
> A. Specifically the law and government, no.
>
> Q. Tells us Christians forgive one another?

6

> A. Yes.
>
> Q. But that's not inconsistent with the government's responsibility to uphold the law and bring the punishment which—and the word of the Lord, that you have just read, that bring judgment on themselves; is that correct?
>
> A. That's correct.

(*Id.* at 1841.)  Tanner then invoked the beliefs of Jesus Christ to assert both that the death penalty was the appropriate sentence and that mercy was uncalled for:

> Q. [W]hen Christ was on the cross there was a condemned felon beside him that repented and accepted Christ; is that right?
>
> A. That's right.
>
> Q. But he didn't take that felon off the cross or forgive the death penalty, did he?
>
> A. No.

(*Id.* at 1842.)  On re-cross examination—despite the absence of any questions on religious theology during redirect—Tanner confirmed his interpretation of the Book of Romans:

> Q. Christ died for sinners?
>
> A. Yes.
>
> Q. And Paul died because of Christ?
>
> A. Yes.

7

> Q. Is there anything inconsistent with that, that these men face the death penalty for the murder of a seventeen-year-old girl?
>
> A. No.

(*Id.* at 1845.)

c. In his closing argument, Tanner again called for submission to the views of those in authority and adverted to the supposed biblical injunction against showing mercy to those who have committed crimes. Paraphrasing the earlier quotation of Romans 13:2 that those who "rebel[] against the authority . . . will bring judgment on themselves," he told the jury that Farina and his codefendant had "brought this judgment upon themselves." (Doc. 65, Ex. F-28, at 2366).

d. The jury acted in accordance with the religious authority in which Tanner cloaked the prosecution's position, unanimously recommending a sentence of death. That 12–0 vote stands in striking contrast with the closely divided 7–5 vote in Farina's first trial, when the religious tactic was not employed.

2. The Supreme Court of Florida affirmed Farina's death sentence by a vote of 4–3. *Farina*, 937 So. 2d at 635. The majority "condemned the invocation of religious authority in capital

8

sentencing proceedings," *id.* at 629, but nevertheless found no fundamental error in Farina's trial.    The majority reasoned that because Reverend Davis "initially broached religion" in his direct testimony, Tanner was merely "attempt[ing] to reconcile that subject with the issues before the court."    *Id.* at 631.    It further ruled that because the invocation of religious authority came during cross-examination, Tanner's tactic was a permissible "attempt to discredit Davis's testimony."    *Id.* at 632.    Finally, the majority believed that there was "no other evidence about religion, and there were no questionable tactics used in sequestering the jurors."    *Id.* at 633.

The three dissenters would have reversed on the basis of the cross-examination of Reverend Davis.    The dissenting opinion found it to be "patently clear from the record here that the references to biblical law in the instant case were extensive and egregious."    *Farina,* 937 So. 2d at 638 (Anstead, J., concurring in part and dissenting in part).    The dissent concluded that, "instead of limiting himself to the topic of reform and rehabilitation for which the witness was called," Tanner "presented the jury with a biblical roadmap by which the defendant had condemned himself to a judgment of death."    *Id.* at 641.    That cross-examination—which the

9

dissent found to be "obviously planned and well-prepared, but grossly improper"—was exacerbated by questions during jury selection that were designed to foreshadow the biblical argument and by a paraphrase of Tanner's biblical message at the end of his closing argument. *Id.* at 643. The dissent concluded that "[t]his blatant and emotional appeal to religious authority to guide the jury's decision clearly infected the fundamental fairness of the proceeding and should be condemned." *Id.*

3.    Having exhausted his state remedies, Farina timely filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254. The district court denied the petition. *Farina v. Sec'y, Dep't of Corr.*, No. 6:06–cv–1768, 2012 WL 1016723 (M.D. Fla. Mar. 26, 2012). The court found that there was "nothing inherently problematic with [Tanner's] questioning of Davis when Petitioner made religion and his religious beliefs an issue by calling this witness." *Id.* at *49. The court reasoned that "[t]he prosecutor did not mention or argue religion in his closing argument" and expressed the belief that the prosecutor's cross-examination did not "exceed[] the scope of the religious matter explored on direct" because "defense counsel asked searching questions that highlighted Petitioner's religious beliefs

and practices." *Id.* at *48 (identifying testimony that Reverend Davis "visited Petitioner once a month for an hour, and during that time had many in-depth talks with him about his life and religion").

4.    This Court granted a certificate of appealability as to this issue.

## SUMMARY OF ARGUMENT

This case involves an extraordinary exchange between the prosecutor and petitioner's prison pastor during the sentencing phase of petitioner's capital trial.  Using the pastor's testimony about petitioner's embrace of Christianity as a pretext, the prosecutor asked the pastor to recite verse after verse from the Book of Romans, all the while suggesting that the Christian Bible precludes mercy, dictates the imposition of the death penalty, and demands deference to the prosecuting authorities' decision about appropriate punishment.

There is no constitutionally legitimate basis for a prosecutor to inject religious teachings into the jury's choice of life or death in a capital case.  The state courts of Florida are not ecclesiastical courts, and the entanglement of religious doctrine in a criminal trial is the kind of breach of church-state separation that not only

11

prejudices the defendant but also injures the interests of the diverse religious communities that thrive in our society in part by virtue of their independence from the operations of the state.    The Constitution prohibits the application of religious law to criminal defendants precisely because different religious groups (including different Christian denominations) have differing views about theological rules and the interpretations of biblical texts—such as the teachings of religion regarding the morality of capital punishment.  Prosecutor Tanner's use of Reverend Davis to instruct the jury that religious law called for a sentence of death was grossly improper.

Tanner's invocation of his particular understanding of Christian doctrine was all the more egregious because it subordinated the discretion of the jurors to that of the prosecuting authorities.  By invoking the "infallible word of God" to support the argument that Farina deserves no mercy, and by suggesting that the jurors would be defying God's authority by refusing to acquiesce in the verdict requested by the State, Tanner undermined the jury's authority.    Conveying that message ran afoul of the Supreme Court's unequivocal direction that efforts to dilute the jury's

12

understanding of its discretion and responsibility constitute fundamental error in a capital penalty trial.  *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

The State's invocation of religious doctrine cannot be excused as having been invited by Farina.  The defendant's presentation of evidence that he had become a devout Christian cannot reasonably be said to have opened the door to an exploration of biblical hermeneutics.   Nor can it reasonably be claimed that the prosecutor's exegesis did not prejudice Farina:  It struck at the heart of the question before the jury; it took place without a curative admonition from the judge; and it yielded an outcome far different than the one in an earlier sentencing proceeding that was devoid of any religious appeals.

## ARGUMENT

This case involves an egregious misappropriation of religion. The Supreme Court has made clear that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it can legitimately consider in reaching a verdict.  The Court has likewise made clear that the jurors must understand that the

13

sentencing decision is committed to their discretion and must not be led to believe that mercy is unavailable or improper.

Prosecutor Tanner's inflammatory tactics disregarded the Supreme Court's directives in a manner that was highly prejudicial to Farina. Indeed, Tanner's use of religious doctrine to control the jury's verdict was a perversion of the American justice system. Although some nations may structure their justice systems around the teachings of a dominant religion, such an approach is emphatically alien to and unacceptable in American justice.

## I.    BY INVOKING THE BOOK OF ROMANS TO JUSTIFY CAPITAL PUNISHMENT, PROSECUTOR TANNER IMPERMISSIBLY INJECTED RELIGIOUS DOCTRINE INTO THE JURY'S DECISION-MAKING PROCESS.

"[R]eligious arguments have been condemned by virtually every federal and state court to consider their challenge." *Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2000). And for good reason. Whereas a defendant has a "right to a verdict based solely upon the evidence and the relevant law," *Chandler v. Florida*, 449 U.S. 560, 574 (1981), prosecutorial appeals to religion are "calculated to arouse the emotions" of the jury. *Oakley v. State*, 68 S.W.2d 204, 207 (Tex. Ct. Crim. App. 1934); *see also Carruthers v.*

14

*State*, 528 S.E.2d 217, 221 (Ga. 2000) ("[B]iblical references inject the often irrelevant and inflammatory issue of religion into the sentencing process and improperly appeal to the religious beliefs of jurors in their decision on whether a person should live or die."). Such emotional appeals have great force:

> [Biblical] arguments come from a source which 'would likely carry weight with laymen and influence their decision,' [and] the effect may be highly prejudicial to the defendant, and the confidence in the reliability of the jury's decision which must guide the imposition of the death penalty may be undermined.

*Jones v. Kemp*, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989) (citation omitted). Indeed, invoking religious principles invites the jurors to rely on their most fundamental and ingrained biases.

There are obvious problems when a jury's focus is directed to religious doctrine instead of the application of secular law to the facts presented. And yet, prosecutors eager to secure verdicts at all costs continue to appeal to jurors' religious beliefs. When they do so, courts have been quick to condemn the conduct. As one court put it, "implying God is on the side of a death sentence is an intolerable self-serving perversion of Christian faith as well as the criminal law of this State" and "is rank misconduct." *Long v. State*,

883 P.2d 167, 177 (Okla. Crim. App. 1994).  And the Pennsylvania Supreme Court has gone so far as to "admonish all prosecutors that reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se and may subject violators to disciplinary action." *Commonwealth v. Chambers*, 599 A.2d 630, 664 (Pa. 1991).  In sum, as the Connecticut Supreme Court has observed, "courts overwhelmingly have taken a disapproving approach to the prosecutorial use of religious imagery and references during trials." *State v. Ceballos*, 832 A.2d 14, 32 (Conn. 2003); *see also, e.g.*, *Malone v. State*, 168 P.3d 185, 209 (Okla. Ct. Crim. App. 2007) ("This invocation of religious belief and obligation in the context of a capital sentencing recommendation is totally inappropriate.").

In this case, the prosecutor's invocation of the Bible had no legitimate purpose.  It was designed to inflame the emotions of the jurors and to convince them that their faith required them to recommend the death penalty.  To accomplish that end, Tanner chose a particularly problematic biblical passage in Romans 13. Whereas many references to scripture *imply* a religious stance of one sort or another on capital punishment, Romans 13 is unusually

explicit in elevating the prosecutor as "God's servant and agent to wrath" and warning that those who "rebel[] against the authority" of the prosecutor "will bring judgment on themselves." (Doc. 65, Ex. F-24, at 1840.)

At least two courts have vacated death sentences because the jury was exposed to the very same passages invoked by the prosecution in this case. In *Sandoval*, the Ninth Circuit granted habeas relief to a capital defendant after the prosecutor invoked the Book of Romans to convey to the jurors that they had an obligation of conscience to endorse the prosecutor's request for a death sentence. 241 F.3d at 779. And the Colorado Supreme Court similarly vacated a death sentence after jurors had improperly consulted Romans 13 during their deliberations, reasoning that "[a] religious text mandating the death penalty . . . creat[es] a reasonable possibility that a typical juror would be influenced in voting on the verdict." *People v. Harlan*, 109 P.3d 616, 631 (Colo. 2005).

To make matters worse, in presenting to the jury his and Reverend Davis's understanding of the teachings of the Book of Romans regarding capital punishment, Tanner promoted one

17

viewpoint—that of Southern Baptists—in a highly contentious doctrinal dispute.  Whereas the Southern Baptist Convention met in Orlando in 2000 to pass a resolution supporting capital punishment "as a legitimate form of punishment,"[3] other organized religious groups, including other Christian denominations that accept the authority of the Book of Romans, have reached different conclusions.

Many religious groups—including other Baptists—deem capital punishment to be intolerable under any circumstances.  In 1982, the American Baptist Church passed a resolution "condemn[ing] the reinstatement of capital punishment and oppos[ing] its use under any new or old state or federal law."  The National Council of Churches likewise supports a moratorium on executions and in 2000 noted that it had "firmly stated its opposition to the death penalty" and that it would "continue[] to do so since ultimate judgment rests with God, the creator of life."[4]  The Episcopal Church has stated and "reaffirm[ed its] position . . . in

---

[3] Southern Baptist Convention, Resolution on Capital Punishment (2000).

[4] Nat'l Council of Churches, *NCC Supports Moratorium on Death Penalty* (2000).

opposition to capital punishment."[5]   Other religious groups, too, oppose capital punishment in all circumstances.[6]

Some religious groups accept the appropriateness of capital punishment in theory but believe that substantial limitations must be placed on its use. The U.S. Conference of Catholic Bishops has determined that "[t]he sanction of death, when it is not necessary to protect society, violates respect for human life and dignity."[7]   And longstanding rabbinical interpretations of the Old Testament permit capital punishment in only the narrowest of circumstances.[8]

---

[5] Episcopal Church, *Journal of the General Convention of the Episcopal Church, Phoenix, 1991*, at 377 (1992).

[6] *See, e.g.*, Cent. Conf. of Am. Rabbis, Resolution of March 1979; Gen. Assemblies of the Unitarian Universalist Ass'n, 1979 General Resolution; All-American Council of the Orthodox Church in Am., *Minutes of the Ninth Plenary Session* (1989).

[7] U.S. Conf. of Catholic Bishops, *A Culture of Life and the Penalty of Death* 3 (2005); *see* Catechism of the Catholic Church No. 2267 (permitting capital punishment only "if this is the only possible way of effectively defending human lives against the unjust aggressor").

[8] Ben Zion Bokser, *Statement on Capital Punishment, in* 3 Proceedings of the Committee on Jewish Law and Standards 1927–1970, at 1537–38 (1960) ("The rabbis demanded a condition of cool premeditation in the act of crime before they would sanction the death penalty; the specific test on which they insisted was that the criminal be warned prior to the crime, and that the criminal indicate by responding to the warning, that he is fully aware of his

Other religious groups (1) "entrust[] the state with power to take human life;"[9] (2) "call upon [C]ongress and state legislatures to enact legislation which will direct the death penalty for" certain crimes;[10] or (3) disavow any religious viewpoint on "a matter to be decided solely by the prescribed processes of civil law."[11]

The point is not, of course, that one of these religious groups is correct and that all of the others are wrong. It is that government is prohibited from choosing among them. Above all, the First Amendment "forbids . . . the preference of a religious doctrine." *Epperson v. Arkansas*, 393 U.S. 97, 106–07 (1968). "[G]overnment may not promote or affiliate itself with any religious doctrine or organization." *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989).

---

deed, but that he is determined to go through with it. In effect this did away with the application of the death penalty.").

[9] Evangelical Lutheran Church in Am., *A Social Statement On: The Death Penalty*, at 2 (1991).

[10] Nat'l Ass'n of Evangelicals, Capital Punishment 1973.

[11] Church of Jesus Christ of Latter-Day Saints, Capital Punishment, http://www.mormonnewsroom.org/official-statement/capital-punishment (last visited Nov. 18, 2012).

This prohibition benefits both the State and religion. *See* Letter from James Madison to Edward Livingston (July 10, 1822), *in* JAMES MADISON, WRITINGS 786, 789 (Library of Am. 1999) ("[R]eligion & Govt. will both exist in greater purity, the less they are mixed together."). As the Supreme Court has elaborated,

> [the] first and most immediate purpose [of the Establishment Clause] rested on the belief that a union of government and religion tends to destroy government and to degrade religion. The history of governmentally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who held contrary beliefs. That same history showed that many people had lost their respect for any religion that had relied upon the support [of] government to spread its faith. The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its "unhallowed perversion" by a civil magistrate.

*Engel v. Vitale*, 370 U.S. 421, 431–32 (1962) (footnotes omitted).

Tanner's examination of Reverend Davis suggested that a particular theological construction of the Book of Romans was an appropriate consideration in making the life-or-death sentencing decision in a capital trial. As noted, this position transgresses

21

deeply held religious views of many in our society.  The examination thus ran afoul of the principle that "one religious denomination cannot be officially preferred over another."  *Larson v. Valente*, 456 U.S. 228, 244 (1982).

In short, the prosecutor's reliance on religious doctrine—and his selection of the Southern Baptist interpretation of that doctrine, to the exclusion of all other interpretations—drew on the jurors' greatest susceptibilities, thereby gravely compromising Farina's entitlement to a sentencing based on statutory considerations.

## II. TANNER'S USE OF RELIGIOUS DOCTRINE UNDERMINED THE SENTENCING DISCRETION OF THE JURY.

Moreover, by asserting that a higher authority—indeed, the highest authority—had already determined the appropriate sanction for Farina's conduct, Farina's prosecutor violated the rule against undermining the responsibility and discretion of the jury.  The Supreme Court has held that, when a jury is charged with the responsibility of rendering a verdict in a capital case, the defendant's constitutional rights are violated if the prosecutor or the court suggests to the jury "that responsibility for determining the

appropriateness of a death sentence rests not with the jury," but elsewhere. *Caldwell*, 472 U.S. at 323. As this Court has observed:

> Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint.

*Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated per curiam*, 809 F.2d 700 (11th Cir. 1987) (en banc).

That is precisely what happened here. By providing Reverend Davis with a copy of the Bible, having him read scripture into the evidentiary record, and leading him to express certain interpretations of the biblical text, Tanner claimed a mantle of religious authority as "God's servant and agent to wrath, to bring punishment to the wrongdoer." He used that mantle to impress upon the jurors that it was "necessary to submit to the authorities"—*i.e.*, the prosecutor, Tanner—"because of the possible punishment" and their "conscience." (Doc. 65, Ex. F-24, at 1840.)

By exploiting biblical doctrine in this way, Tanner led the jury to believe that true responsibility for determining punishment lay with his office and that good Christians would yield to its authoritative judgment. By invoking the "infallible word of God" to support the argument that Farina deserved no mercy, and by suggesting that the jurors would be defying God's authority by refusing to acquiesce in the verdict requested by the State, Tanner undermined the jury's authority.

In *Caldwell*, the Supreme Court reversed a death sentence because the prosecutor had sought to alleviate the jurors' burden of responsibility by promising them that their verdict would be automatically reviewed on appeal. 472 U.S. at 333. The Court explained that the prosecutor's promise "present[ed] an intolerable danger that the jury will in fact choose to minimize the importance of its role," which violates the Eighth Amendment's requirement that the jury make an individualized decision that death is the appropriate punishment in a specific case. *Id.*; *see also Darden v. Wainwright*, 477 U.S. 168, 183 n.15 (1986) (explaining that *Caldwell* applies to comments that "mislead the jury as to its role in

24

the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision").

In *Sandoval*, the Ninth Circuit applied *Caldwell* to an invocation of Romans 13. The court granted habeas corpus relief to the petitioner in that case because "[a]rgument involving religious authority . . . undercuts the jury's own sense of responsibility for imposing the death penalty." *Sandoval,* 241 F.3d at 777. After identifying the rule in *Caldwell* that a prosecutor may not "transfer the jury's sense of sentencing responsibility to a higher court," the *Sandoval* court reasoned: "A fortiori, delegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process." *Id.*

As in *Sandoval*, Tanner's conduct here plainly violates *Caldwell*. Indeed, Tanner's conduct here was far *more* offensive than the prosecutor's conduct in *Caldwell* because the cross-examination effectively suggested that God—the most authoritative of all authorities—had already decided in favor of death. This suggestion distorted the jury's role in the sentencing process into one of obedience to the state's authority to punish, and to God's authority to demand the most severe punishment. Tanner thereby

25

introduced "substantial unreliability" into Farina's trial. *See Caldwell*, 472 U.S. at 330.

Tanner also violated the rule that the government may not vouch for its own case. *See Berger v. United States*, 295 U.S. 78, 85–89 (1935). As the Supreme Court has recognized, when the prosecutor injects his own views into the case, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (1985). Tanner's questioning specifically invited the jury to "trust the Government's judgment" on the appropriate punishment in a manner that cannot be reconciled with governing Supreme Court authority.

## III. THESE CONSTITUTIONAL VIOLATIONS CANNOT BE DISMISSED AS A HARMLESS FORAY THAT WAS INVITED BY FARINA'S TENDERING OF HIS PASTOR AS A CHARACTER WITNESS.

### A. Petitioner Did Not Open The Door To The Prosecutor's Invocation Of Religious Doctrine.

Both the Florida Supreme Court and the district court held that the defense opened the door to Tanner's cross-examination by proffering testimony about Farina's reformed character that

included his embrace of Christianity. *Farina*, 937 So. 2d at 632; *Farina*, 2012 WL 1016723, at *48. That holding is legally erroneous.

The Supreme Court has held that the jury must be free to consider "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (internal quotation marks omitted); *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion). Here, Farina introduced evidence of his newfound Christian faith as a mitigating factor for the jury to consider—part of an effort to demonstrate that he posed no threat of future danger to the community and a "mercy plea" to the jury's compassion. *Caldwell*, 472 U.S. at 331 (alterations and internal quotation marks omitted).

Although eliciting evidence of religious conversion might well open the door to cross-examination to impeach the genuineness of the asserted conversion, Tanner's cross-examination was in no way directed to that question. Far from it: The questioning introduced religious doctrine for the proposition that the genuineness of

27

Farina's apparent repentance and reformation was *irrelevant* because the Bible commands the death penalty and requires jurors' deference to the prosecutor's choice of punishment regardless of changes in Farina's character.    Moreover, nothing in Reverend Davis's testimony suggested that the Bible requires mercy; consequently, the suggestion that Christian doctrine in fact required the death penalty was well beyond the scope of the direct.

Thus, it was error for the district court to rely (*Farina,* 2012 WL 1016723, at *48) on this Court's statement that "there is nothing inherently problematic with a prosecutor's asking religious questions while cross-examining defense witnesses who were put on the stand to testify about a capital defendant's religion, *so long as the cross-examination does not exceed the scope of the religious subject matter explored on direct.*"    *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304, 1311 (11th Cir. 2008) (emphasis added).[12]

_____

[12] There are substantial differences between *Shere* and this case.    *First*, *Shere* did not involve a prosecutor's efforts to convey to the jury "the proposition that a higher authority mandates death for murderers."    537 F.3d at 1311.    *Second*, when the prosecutor in *Shere* attempted to elicit testimony about the biblical appropriateness of the death penalty for premeditated murder, the trial court sustained an objection.    *Id.* at 1309.    *Third*, whereas Shere "[did] not contend the prosecutor made improper Biblical

In short, Farina's mitigation evidence that he is personally sincere in his religious beliefs did not invite inquiry into the abstract, theological question regarding the role of the death penalty in Christian thought. *Cf. Young*, 470 U.S. at 11-12 (explaining the "'invited reply' rule," in which the "defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant"). Instead of seeking to demonstrate to the jurors that Farina did not deserve their mercy, or that his asserted adherence to the Christian faith was not genuine, Tanner sought to intimidate them with the authority of biblical doctrine. As in *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001), the prosecutor sought to convey to the jury that "'the concept of mercy—the most significant factor which might point toward a choice of life imprisonment—[was] illegitimate.'" *Id.* at 1367 (quoting *Wilson v. Kemp*, 777 F.2d 621, 626 (11th Cir. 1985)). And he sought to take away the jurors' choice completely by insisting that they "submit" to God's authority.

arguments to the jury during closing," *id.* at 1311, the prosecutor here paraphrased his religious argument to the jury during closing, *see supra,* page 8. *Fourth*, whereas the prosecutor in Shere was responding to "fairly searching questions" about the defendant's "religious beliefs and practices," 537 F.3d at 1311, the direct examination of Reverend Davis did not at all address the biblical topics raised by the prosecutor on cross-examination.

This conduct cannot be justified under the door-opening rationale relied on by the Florida Supreme Court and the district court.

## B. The Constitutional Violations Were Highly Prejudicial To Petitioner.

The prosecutor's deliberate misconduct in this case was directly relevant to the jury's verdict and tacitly sanctioned by the trial court. The presentation was designed to prejudice Farina, and it succeeded.

Because this was Farina's sentencing phase, and the jury was exercising broad discretion in determining whether he should be sentenced to life in prison or death, the error cannot simply be dismissed as bearing on another issue. Rather, Tanner used the Book of Romans to offer an answer to the question at the heart of the jury's work: whether Farina deserved the death penalty. "[S]uggesting that [the defendant's] embrace of faith dictated that he be judged by Biblical standards of justice was improper" and had a "highly prejudicial effect." *Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005).

Here, defense counsel objected to the relevance of the prosecutor's line of questioning, and the trial court tepidly

requested the prosecutor to "connect it up" to the witness's testimony and avoid "a philosophical or religious discussion." *See Farina*, 2012 WL 1016723, at \*46. But the court did not issue any curative rulings or instructions when the prosecutor failed to heed that request. *Cf. Romine*, 253 F.3d at 1369 ("An on-the-spot curative instruction from the court can make a difference" in correcting improper prosecutorial remarks; "failing that, improper argument can sometimes be remedied by the final instructions to the jury."). The court's failure to take corrective action implied to the jury that the prosecutor's line of questioning was in fact proper. *Cf. Darden*, 477 U.S. at 183 n.15 (remarking that judge's approval of comments in *Caldwell* made them more prejudicial).

Although the majority of the Florida Supreme Court believed that religious references during witness testimony are less damaging than religious references during closing arguments (*Farina*, 937 So. 2d at 633), the opposite is true. The jury was instructed that the arguments were not evidence and that its decision was to be based only on the evidence. (Doc. 65, Ex. F-21, at 1218–19; Ex. F-28, at 2402.) Because the religious texts and interpretations introduced by the prosecutor in Farina's trial *were*

31

evidence and were given an imprimatur of theological correctness by the testifying witness's ministerial office, they could not have been more prejudicial. *Cf. Darden*, 477 U.S. at 183 n.15 (indicating that statements made during closing are *less* prejudicial).

Finally, any doubt about whether the jury was in fact prejudiced is put to rest by the results of an earlier proceeding: At his first sentencing trial, during which the prosecutor eschewed religious appeals, the jury recommended death by a close vote of seven to five, *Farina*, 937 So. 2d at 616; at this second trial, in contrast, the jury was unanimous in recommending death. *Cf. Sandoval*, 241 F.3d at 779 (finding prosecutor's invocation of the Book of Romans to be prejudicial error where the previous jury had been "sharply divided" in penalty phase).[13]

---

[13] Farina raised a serious and powerful defense during the penalty phase. That defense included evidence of eighteen mitigating factors, including three statutory factors: that Farina "had no significant history of prior criminal activity," that he was "an accomplice in the capital felony committed by his brother and his participation [in the crime] was relatively minor; he was eighteen years old at the time of the crime." *Farina*, 937 So. 2d at 617 n.3 (internal quotation marks omitted). The nonstatutory factors included his "abused and battered childhood, . . . cooperation with the police, involvement in Christianity and Bible study courses while in prison, good conduct in prison, remorse for what happened, assertion of a positive influence on others, no history of

## CONCLUSION

Prosecutor Tanner's invocation of the Book of Romans invited the jurors to deliver justice in accordance with religious, rather than secular, law. And his reliance on a particular textual interpretation of that biblical passage represented an affront to the diversity of religious thought regarding the passage's implications. The colloquy was also fundamentally unfair to Farina because it suggested to the jurors that their judgment should be guided, if not dictated, by an external authority. By explicitly appealing to the jurors' religious beliefs, and absolving them of full responsibility for imposition of a death sentence, prosecutor Tanner grossly prejudiced Farina's right to a fair trial. The judgment of the district court should therefore be reversed.

---

violence, abandonment by his father, poor upbringing by his mother, lack of education, good employment history, and amenability to rehabilitation." *Id.* (internal quotation marks omitted).

Dated: November 20, 2012

Respectfully submitted,

<u>s/ Brian D. Netter</u>
Andrew L. Frey
Evan M. Tager
Brian D. Netter
E. Brantley Webb[*]
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000

*Attorneys for Amici Curiae*
* Admitted only in Tennessee,
supervised by principals of the firm

## APPENDIX: DESCRIPTIONS OF THE *AMICI*

**Americans United for Separation of Church and State** is a national, nonsectarian public-interest organization dedicated to defending the constitutional principles of religious liberty and separation of church and state.  Americans United represents more than 120,000 members and supporters across the country, including thousands who reside in this Circuit. Since its founding in 1947, Americans United has served as a party, as counsel, or as an *amicus curiae* in scores of church-state cases before the United States Supreme Court, this Court, and other federal and state courts nationwide.

The **American Civil Liberties Union** ("ACLU") is a nationwide, nonprofit, nonpartisan organization with over 500,000 members. The **ACLU of Florida** is a state affiliate of the national ACLU. Throughout its 90-year history, the ACLU has been at the forefront of efforts to protect religious liberty, as well as the rights of persons accused of crimes, particularly those facing or condemned to death, and has appeared before this Court in numerous cases involving those issues, both as direct counsel and as *amicus curiae*.  As organizations that have long been dedicated to protecting and

preserving religious liberty as well as the rights of the accused and the convicted, especially in capital cases, the ACLU and the ACLU of Florida have a strong interest in the proper resolution of this controversy.

The **Union for Reform Judaism**, whose 900 congregations across North America include 1.5 million Reform Jews; the **Central Conference of American Rabbis**, whose membership includes more than 1,800 Reform rabbis; and the **Women of Reform Judaism**, which represents more than 65,000 women in nearly 500 women's groups in North America and around the world, come to this issue out of their longstanding commitment to the principle of separation of church and state, believing that the First Amendment to the Constitution is the bulwark of religious freedom and interfaith amity. The concept of separation of church and state has lifted up American Jewry, as well as other religious minorities, providing more protections, rights and opportunities than have been known anywhere else throughout history. At the same time, these groups believe that the resort to capital punishment either by a state or by the national government is no longer morally justifiable. They believe there is no crime for which the taking of

human life by society is justified, and that it is the obligation of society to evolve other methods in dealing with crime.

**Interfaith Alliance Foundation**, which joins this *amicus* brief, is a 501(c)(3) non-profit organization. Interfaith Alliance celebrates religious freedom by championing individual rights, promoting policies that protect both religion and democracy, and uniting diverse voices to challenge extremism. Founded in 1994, Interfaith Alliance's members across the country belong to 75 different faith traditions as well as no faith tradition. Interfaith Alliance supports people who believe their religious freedoms have been violated as a vital part of its work promoting and protecting a pluralistic democracy and advocating for the proper boundaries between religion and government.

The **National Council of Jewish Women** ("NCJW") is a grassroots organization of 90,000 volunteers and advocates who turn progressive ideals into action. Inspired by Jewish values, NCJW strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms. NCJW's Resolutions state that "religious liberty and the separation of religion and state are constitutional principles

that must be protected and preserved in order to maintain our democratic society." Consistent with their Resolutions, NCJW joins this brief.

The **General Synod of the United Church of Christ** ("UCC") is the representative body of the national setting of the United Church of Christ and is composed of delegates chosen by its conferences from member churches, voting members of Boards of Directors of Covenanted Ministries who have been elected by General Synod as described in the Bylaws of the UCC, and ex officio delegates. The UCC was formed in 1957, by the Union of the Evangelical and Reformed Church and The General Council of the Congregational Christian Churches of the United States in order to express more fully the oneness in Christ of the churches composing it, to make effective their common witness to Christ, and to serve God's people in the world. The UCC has 5,194 churches in the United States with a membership of 1.2 million.

The **Unitarian Universalist Association** ("UUA") comprises more  than 1,000 Unitarian Universalist congregations nationwide. The UUA is dedicated to the principle of separation of church and state. The UUA participates in this *amici curiae* brief because it

believes that the decision of the United States District Court for the

Middle District of Florida in No. 6:06-cv-1768 should be reversed.

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 29(d) and 32(a)(7)(B).  This brief contains 6549 words.

s/ Brian D. Netter

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Brian D. Netter